UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-60274-CR-RUIZ/STRAUSS

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

BENJAMIN DEVEREAUX DOTEN,

    Defendant.

_____/

**REPORT AND RECOMMENDATION**

**THIS CAUSE** came before the Court on the United States of America's Motion for an Order Requiring the Involuntary Treatment of the Defendant to Restore Defendant's Competency Addressing the Remaining Three Prongs of *Sell* ("Motion") [DE 75]. The Motion has been referred to me by the Honorable Rodolfo A. Ruiz, II [DE 76]. I have reviewed the Motion, the Defendant's Response [DE 80], and all other pertinent parts of the record. On September 11, 2023, I held an evidentiary hearing at which I received evidence and heard arguments from counsel and from Barry Wax, who the Court appointed as the Defendant's Guardian Ad Litem ("GAL"). [DE 77]. Having considered the record, the evidence, arguments from counsel, and the GAL's position, I respectfully recommend that the Motion [DE 75] be **GRANTED**.

**I.    BACKGROUND**

The Defendant, Benjamin Devereaux Doten, is charged by Indictment with two counts of Cyber Harassment, in violation of Title 18, United States Code, Section 2261A, and two counts of Interstate Threat, in violation of Title 18, United States Code, Section 875(c). [DE 22]. As

detailed in the findings of fact I made in connection with a May 11, 2023 evidentiary hearing in this case, *see* [DE 62], these charges stem from a spate of threatening phone calls and Tweets that the Defendant directed at the FBI and its agents between March and August 2021. The Defendant was arrested pursuant to a Criminal Complaint on August 24, 2021. He has remained in custody since then.

In December 2021, the Court granted the Defendant's unopposed motion for a competency evaluation by the Bureau of Prisons (BOP), pursuant to Title 18, United States Code, Section 4241. [DE 35, 36]. After receiving a Competency Evaluation and Examination Report from the Bureau of Prisons [DE 39] and holding a status conference with the parties, on March 8, 2022, the Court ordered that the BOP hospitalize the Defendant for treatment to restore competence if possible. [DE 41]. The Defendant was admitted to the Federal Medical Center Butner ("FMC Butner") on November 1, 2022.

On February 24, 2023, Dr. Brianna Grover, a forensic psychologist from the BOP issued a report indicating that the Defendant is suffering from a mental disease or defect, specifically schizoaffective disorder, which interferes with his abilities to rationally understand the proceedings against him, communicate effectively with counsel, assist in his own defense, rationally evaluate evidence, and testify relevantly. [DE 51] at 19-20. Dr. Grover therefore opined that the Defendant is not competent to stand trial. *Id*. at 20. Dr. Grover further opined that there is a substantial probability that the Defendant's competency can be restored with appropriate treatment with antipsychotic medication but that restoration of competency is unlikely without such treatment. *Id*. However, the Defendant has refused such treatment on a voluntary basis. *Id*.

Consequently, the Government filed a Motion for a Finding that the United States Has an Important Governmental Interest Supporting Involuntary Medication to Restore Defendant's Competency [DE 56].  Therein, the Government sought a determination that it has an "important interest" in bringing the Defendant to trial – the first of four factors articulated by the Supreme Court in *Sell v. United States*, 539 U.S. 166 (2003), that the Government must establish in order to administer antipsychotic drugs involuntarily to a mentally ill criminal defendant in order to render him competent to stand trial.[1]  I held an evidentiary hearing on the Government's motion regarding the first *Sell* factor on May 11, 2023, and on May 15, 2023, I entered an Order [DE 62] granting that motion.  That Order, including the findings made therein, is incorporated herein.

After I entered the Order determining that the Government established the first *Sell* factor, Dr. Charles Cloutier, a staff psychiatrist at FMC Butner, prepared a Forensic Evaluation Addendum (dated June 12, 2023) [DE 66], which details a proposed treatment plan and addresses issues related to the remaining *Sell* factors.  As indicated therein, Dr. Cloutier opines, with "reasonable medical certainty," that: (1) "[a]dministration of involuntary antipsychotic medication to [the Defendant] is substantially likely to render him competent to stand trial and is substantially unlikely to interfere with his ability to assist his counsel"; (2) "less intrusive treatments will not achieve the same results"; and (3) "it is clinically appropriate and indicated to treat [the Defendant's] psychotic illness with antipsychotic medication."  [DE 66] at 6.  Consequently, the Government filed the instant Motion [DE 75], requesting that the Court find the remaining *Sell* factors are satisfied and, therefore, order the involuntary administration of antipsychotic medication to the Defendant.

---

[1] The other *Sell* factors are discussed in further detail below.

## II. SEPTEMBER 11, 2023 *SELL* EVIDENTIARY HEARING

At the September 11, 2023 hearing, both Brianna Grover, Psy.D. and Charles Cloutier, M.D. testified. I find that that their testimony was credible and unrebutted. Therefore, I find that the facts elicited through their testimony (and in their expert reports, which were admitted into evidence) – discussed in sections A and B below – were established by clear and convincing evidence. Although Dr. Grover and Dr. Cloutier were the only witnesses at the hearing, the GAL also spoke at the hearing to provide his position. The GAL's position is discussed in section C below.

### A. DR. GROVER

Dr. Grover is a forensic psychologist at FMC Butner. She has worked there since January 2016 and has worked in her current position since July 2019. In that role, Dr. Grover conducts court-ordered forensic evaluations, provides routine clinical care, conducts crisis intervention, and conducts suicide risk assessments. She has completed roughly 120 competency evaluations at FMC Butner and has testified as an expert 25 times (all in federal court).

Dr. Grover was assigned to evaluate the Defendant. She met with the Defendant upon his arrival at FMC Butner (on November 1, 2022), at which time she assessed his general status, provided educational information, discussed confidentiality limitations, obtained the Defendant's history, and determined what housing would be appropriate for the Defendant. Although Dr. Grover could not provide the exact number of times she has met with the Defendant, she testified that she regularly met with the Defendant and that she generally meets with patients for formal interviews twice per month and also sees them informally. However, the Defendant has refused to engage with her since April 2023 (even though she has tried to engage with him since then), when she informed the Defendant of her opinion that he is not competent and that involuntary

4

medication would be requested. At that time, the Defendant indicated he disagreed with Dr. Grover's opinion.

The Defendant has been diagnosed with schizoaffective disorder, bipolar type, as well as substance use disorder, unspecified. Schizoaffective disorder, bipolar type meets the criteria of schizophrenia and includes delusions, disorganized speech, flattening of affect, and symptoms of mood disorder at the same time as symptoms of psychosis. Bipolar type is the mood component of the disorder and entails having experienced manic episodes. Notwithstanding the Defendant's diagnosis, he does have above-average cognitive functioning, and there is no concern that he is exaggerating his symptoms. In fact, he generally functions adequately except when it comes to addressing facts and circumstances related to this case. In discussing the Defendant's lack of competency on cross examination, Dr. Grover explained that the Defendant has maintained that he was working in counterintelligence for agencies against the FBI as a whistleblower and that this case is about the government retaliating against him for whistleblowing. The Defendant has also said that he has a thumb drive at his residence showing that the FBI engaged in illegal activities. When the Defendant has discussed these beliefs with Dr. Grover (as recently as April 2023), and when she has engaged in reality-testing his beliefs, he has been difficult to redirect and has become agitated, so much so that interviews have had to be discontinued.

In her role treating the Defendant, Dr. Grover conducted a competency evaluation following the Defendant's arrival at FMC Butner and referred the Defendant for a psychiatry evaluation and to available groups, including a competency restoration group and an illness management and recovery group. Although the Defendant was offered 37 competency restoration group sessions and 20 illness management and recovery group sessions, he only

attended 8 sessions and 4 sessions, respectively. He has not attended any group sessions since March 2023.

In addition to conducting a competency evaluation and making referrals, Dr. Grover assessed the Defendant's mental status and made recommendations for treatment. Dr. Grover also had discussions with the Defendant about medication on several occasions, but the Defendant repeatedly declined interest in taking medication. He was willing to meet with psychiatry, at least initially. But he declined later meetings and would say he was not interested. The Defendant has also expressed an interest in being declared competent and has asked what he can do to be found competent. In response, he has been encouraged to consider medication and to attend group sessions, but as noted above, he consistently refuses medication and has not attended the substantial majority of group sessions. Dr. Grover, whose testimony was credible, also testified that the Defendant's mental state has not improved at all during his time at FMC Butner. Indeed, Dr. Grover testified that she could not recall any instances of an individual suffering from a psychotic disorder being restored to competency without treatment.

### B. DR. CLOUTIER

Dr. Cloutier is a staff psychiatrist at FMC Butner. He has worked at FMC Butner for close to 3 years and has practiced in psychiatry since 1998. As a staff psychiatrist at FMC Butner, Dr. Cloutier is consulted to evaluate and treat inmates with mental illness. He has substantial experience (more than 20 years) treating individuals with schizoaffective disorder and bipolar disorder, and he has prescribed antipsychotic medications to patients in dozens of cases. He has also testified as an expert 8 times (in federal court).

Dr. Cloutier is familiar with the Defendant's diagnosis (schizoaffective disorder, bipolar type). He has met with the Defendant on roughly 3 or 4 occasions – to interview and/or treat the

6

Defendant. The Defendant has also been seen by psychiatric nurse practitioners approximately 6 times. The Defendant first met with Dr. Cloutier on November 15, 2022. The purposes of that meeting included introducing the treatment team (consisting of Dr. Cloutier, Dr. Grover, and others) and discussing other issues such as taking psychiatric medication. Dr. Cloutier was asked to evaluate the Defendant for treatment with antipsychotic medication. When Dr. Cloutier discussed the topic of medication with the Defendant, the Defendant refused to consider taking any medication, indicating he felt strongly that he did not have a mental illness that required medication.

Based on information gathered, including from the Defendant's mother,[2] in 2011 the Defendant was prescribed two different antipsychotic medications, Aripiprazole and Quetiapine. Based on the Defendant's mother's recounting, it appears the Defendant responded to Aripiprazole. However, Dr. Cloutier has not been able to ascertain the extent to which the Defendant responded because FMC Butner has not been able to obtain the Defendant's treatment records.

Dr. Cloutier offered Aripiprazole and Quetiapine to the Defendant, but the Defendant declined both medications. The Defendant recalled that one medication was sedating and that the other caused restlessness. Dr. Cloutier discussed alternative medications, but the Defendant also declined alternatives. The Defendant has consistently declined medications. Dr. Cloutier has

---

[2] Dr. Cloutier's Forensic Evaluation Addendum indicated that he had reviewed the Defendant's electronic medical and psychological records from the Bureau of Prisons (BOP), as well as the previous forensic evaluations – by BOP Forensic Psychologist Lisa Feldman and Dr. Grover – in the record of this case. Dr. Feldman's report [DE 39] relayed medical and psychiatric history provided by the Defendant and his mother, including information about his mental health treatment at Fort Lauderdale Hospital in 2011. However, Dr. Cloutier testified that efforts to obtain medical records from Fort Lauderdale Hospital have been unsuccessful.

not seen any improvement with the Defendant's competency during the Defendant's time at FMC Butner.

According to Dr. Cloutier, studies he has considered demonstrate restoration or response rates (to antipsychotic medication) of roughly 75% (low 70s to high 80s) for inmates with psychosis.[3]  The response rate for patients with schizoaffective disorder (the Defendant's illness) is actually around 81%.  Those in the studies that were not restored to competency (roughly 25-30%) often had characteristics such as hormonal issues, neurocognitive issues, dementia, or a long duration of receiving no treatment.  The Defendant does not suffer from the types of conditions seen in the group that was not restored to competency.  Dr. Cloutier has considered the fact that the Defendant has not received antipsychotics in a long time, but he believes the Defendant is likely to respond to treatment, especially because the Defendant does not have the co-morbid features or illnesses (like neurocognitive deficits) that those in the group not restored to competency had.

If the Court orders involuntary medication, Dr. Cloutier recommends that the Defendant be treated with Haloperidol (Haldol), which is a first-generation or "typical" antipsychotic medication.  It can be administered orally or by intramuscular injection in either a short-acting or long-acting formulation.  Although there is no cure for psychotic disorders, antipsychotic medications are very effective in treating symptoms.

There are some risks, however.  A common side effect includes tremors (though the Defendant did not report experiencing tremors when he was previously on antipsychotic medication).  Some sedation and acute muscle spasms are also possible.  But the foregoing risks

---

[3] Further details regarding these studies are included in the FMC Butner Sell Appendix 2021, which was attached to Dr. Cloutier's Forensic Addendum [DE 66 at 7-17] and offered into evidence at the September 11 hearing as Government's Exhibit 3.

can be mitigated with medication to counterbalance the side effects, and Dr. Cloutier has no particular concerns regarding side effects for the Defendant. There is nothing in the Defendant's history that contraindicates Haldol.

In recommending Haldol for the Defendant, Dr. Cloutier also considered other antipsychotic medications. For instance, he considered Aripiprazole, but he is not recommending it because it does not come in a short-acting form and Dr. Cloutier does not want to start the Defendant on a long-acting version without knowing more about how the Defendant will react to the medication. Dr. Cloutier has specifically recommended Haldol over other antipsychotic medications because Haldol is available in an immediate-acting injectable form, which will help ensure that the Defendant will not suffer an allergic reaction before a long-acting version is used. Any effects from the short-acting form will be seen within hours, and the short-acting form will clear the Defendant's system much faster than the long-acting form. Based on his experience, Dr. Cloutier believes that Haldol is the best option for the Defendant. He testified that it is very effective and that it will help prevent further deterioration. Without medication, Dr. Cloutier believes that the Defendant's condition could worsen. At a minimum, it will not improve.

Moreover, FMC Butner has programs in place to closely monitor individuals when antipsychotic medications are administered. Before proceeding with involuntary administration if ordered, FMC Butner would first meet with the Defendant to discuss options and to see if the Defendant will take the medication orally. If the Defendant will not take the medication orally, there are specific protocols for administering the medication. For instance, an additional series of routine labs and an EKG would be completed. This will allow medical staff to obtain a baseline and vitals and to ensure there are no contraindications. Nonetheless, presently, the Defendant

does not have any medical diagnosis that reveals any potential issues with the Defendant being administered Haldol.

In addition to the possible side effects mentioned above, tartive dyskinesia is also a potential side effect, but it is unlikely in the short term. And sudden cardiac death is an "exceedingly rare" side effect (4 in 10,000, or 0.04%). But as noted above, the Defendant was previously on antipsychotic medication (with no reported side effects other than some sedation and restlessness), and nothing in the Defendant's history contraindicates Haldol. Dr. Cloutier does not believe the Defendant is substantially likely to have any "serious" side effects, though, again, some side effects are common.

Also, Dr. Cloutier credibly testified that the potential side effects of Haldol would not interfere with the Defendant's ability to confer with his attorney. If side effects do occur, they would be managed by reducing the dose administered to the Defendant and by moving more slowly. Additionally, as indicated above, other medications would be used to treat any side effects the Defendant experiences. If not helpful, medical staff would administer a different medication.

Regarding the dose of Haldol that would be administered, Dr. Cloutier recommends starting at a low dose of 5mg, or potentially even starting as low as 1mg and titrating over time. These doses are medically accepted. Again, the Defendant would first be offered the opportunity to take an oral form of Haldol (the oral form is administered daily), but Dr. Cloutier does not believe the Defendant will comply with taking the medication orally given that the Defendant has repeatedly and consistently refused to take anti-psychotic medication. If the Defendant again refuses an oral form, Dr. Cloutier recommends administering the medication by intramuscular injection and giving the Defendant a single dose, then waiting a day to evaluate the Defendant for

any potential allergic reactions. Ultimately, the medication would be administered monthly (or potentially every 2-4 weeks, but not more frequently).

If the Defendant again refuses to take Haldol orally (after being presented with a court order), the Defendant would be restrained while the Haldol is administered (via intramuscular injection). However, FMC Butner staff would follow very specific protocols, including video recording the entire interaction.

Ultimately, in addition to the testimony described above, Dr. Cloutier credibly testified that: (1) there is a substantial likelihood that the Defendant will respond positively to the recommended treatment plan; (2) the treatment is substantially likely to restore the Defendant to competency; (3) there is no less intrusive treatment that can be used to restore the Defendant to competency; (4) antipsychotic medication is necessary to restore the Defendant to competency (without them, the Defendant is unlikely to be restored to competency because nothing other than antipsychotic medication will treat the core features of the Defendant's illness); and (5) the treatment plan for the Defendant is medically appropriate. Dr. Cloutier expects the competency restoration process to take between 4 and 8 months for the Defendant (which is the amount of time the process takes for the majority of patients).

### C. GAL'S POSITION

The GAL's position is that he cannot substitute his judgment for the Defendant's decision on not wanting to take antipsychotic medication. In formulating his position, the GAL (among other things) reviewed all of the documents in the court file regarding the Defendant's mental health, reviewed relevant case law, spoke with the Defendant's mother, and spoke with the Defendant and his counsel for about 40 minutes. Unfortunately, though, the call with the Defendant had to be terminated before the GAL was able to discuss "the most salient points" with

the Defendant. During the call, however, the Defendant was able to communicate the reasons for his decision. While the GAL's present position is that he does not believe he can substitute his judgment for the Defendant's position, the GAL indicated he would need more time to fully evaluate the matter. The GAL also indicated he thought it may be appropriate to order the Defendant to voluntarily take antipsychotic medication under the penalty of contempt before the Court orders the involuntary administration of such medication.

### III.   LEGAL STANDARD

The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the Government from prosecuting defendants who are incompetent. *See* U.S. Const. Amend. V; *Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."). In *Sell*, the Supreme Court held that, while an individual has a significant constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs, it is constitutionally permissible to administer antipsychotic medication to a mentally ill defendant against his will in order to render him competent to stand trial if the Government demonstrates four factors by clear and convincing evidence. *See* 539 U.S. at 180-81; *see also United States v. Diaz*, 630 F.3d 1314, 1331-32 (11th Cir. 2011) (holding that, in *Sell* cases, the Government must prove factual questions by clear and convincing evidence). Those factors are: "(1) the government has an 'important' interest in going to trial; (2) involuntary medication would 'significantly further' the governmental interest; (3) involuntary medication is necessary to further the governmental interest; and (4) involuntary medication is medically appropriate, '*i.e.,* in the

patient's best medical interest in light of his medical condition.'" *Diaz*, 630 F.3d at 1331 (citing *Sell*, 539 U.S. at 179-83).

### IV. DISCUSSION

I have considered the *Sell* factors,[4] which I find are satisfied here (by clear and convincing evidence). The first *Sell* factor is satisfied for the reasons stated in my May 15, 2023 Order. While the Defendant argues that I should revisit my ruling regarding the first *Sell* factor, I decline to do so for the reasons explained in my May 15, 2023 Order. I do note, however, that it may be appropriate to revisit that ruling if the Defendant is not restored to competency within 8 months of the entry of an order adopting this Report.[5] Regarding the second, third, and fourth *Sell* factors, they are satisfied based on the evidence presented at the September 11, 2023 evidentiary hearing and for the reasons discussed in sections A-C below.

#### A. Second *Sell* Factor

The second *Sell* factor is met here. This factor – "whether involuntary medication will significantly further the government's interest" – requires considering and determining "(1) whether medication is 'substantially likely to render the defendant competent to stand trial,' and (2) whether the medication is 'substantially unlikely to have side effects that will interfere

---

[4] As a preliminary matter, I find, based on the evidence presented at the May 11, 2023 and September 11, 2023 evidentiary hearings, that involuntary medication is not appropriate – under *Washington v. Harper*, 494 U.S. 210 (1990) – on the ground that the Defendant poses a danger to himself or others. I specifically note that Dr. Cloutier's Forensic Evaluation Addendum, which was admitted into evidence at the September 11, 2023 evidentiary hearing, states that despite the Defendant's "continued psychosis," his "behavior and self-care never deteriorated to the point of dangerousness requiring emergent involuntary medication or involuntary medication for dangerousness (including grave disability) under *Harper*." [DE 66] at 3.

[5] Eight months is the upper range of the amount of time Dr. Cloutier estimates it will take to restore the Defendant to competency. Eight months from now, the Defendant will have been in custody for nearly 33 months, which falls within the Government's estimated guideline range, and which is roughly two-thirds of the 5-year statutory maximum.

significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.'" *Diaz*, 630 F.3d at 1332 (quoting *Sell*, 539 U.S. at 181).

I find, based on the testimony and evidence, that medication is substantially likely to render the Defendant competent to stand trial. Dr. Cloutier credibly testified that the recommended course of treatment for the Defendant – which was specified in both the Forensic Evaluation Addendum [DE 66] and in Dr. Cloutier's testimony – is substantially likely to restore the Defendant to competency. In so opining, Dr. Cloutier relied on studies showing that roughly 75% of patients with psychosis were restored to competency with the use of antipsychotic medication. Moreover, Dr. Cloutier made clear that he considered the Defendant's specific diagnosis, and he noted that the restoration rate was even slightly higher (around 81%) for patients with that diagnosis. Significantly, the Eleventh Circuit has found substantially similar evidence to be adequate to support the Government's burden on the second *Sell* factor. *See Diaz*, 630 F.3d at 1332-33; *United States v. Ruark*, 611 F. App'x 591, 598 (11th Cir. 2015). Furthermore, based on Dr. Cloutier's testimony, the Defendant bears none of the common hallmarks of individuals for whom antipsychotic medication failed to restore competency.

Regarding the issue of side effects, it is evident from Dr. Cloutier's testimony that at least certain side effects are common with antipsychotic medication (including Haldol). But "[u]nder *Sell*, the pertinent side effects are those that could impede a defendant's ability to assist counsel." *Diaz*, 630 F.3d at 1333. Notably, in the Forensic Evaluation Addendum, Dr. Cloutier opines, with "reasonable medical certainty," that involuntary psychiatric mediation "is substantially unlikely to interfere with [the Defendant's] ability to assist his counsel." [DE 66] at 6. I find that this opinion was supported by Dr. Cloutier's credible testimony at the September 11, 2023 evidentiary hearing. As noted above, Dr. Cloutier credibly testified that the potential side effects of Haldol

14

would not interfere with the Defendant's ability to confer with his attorney. The most common side effects identified by Dr. Cloutier are tremors, sedation, and muscle spasms. Without minimizing the discomfort of such potential side effects, none of these appear likely to interfere with the Defendant's ability to confer with his attorney, and Dr. Cloutier credibly testified that further medication can address these most common side effects. Moreover, Dr. Cloutier credibly testified that the recommended treatment plan for the Defendant will ensure that the Defendant is closely monitored, and medical staff will move slowly to attempt to minimize any side effects, including those rare side effects that are potentially more debilitating.

In his Response, the Defendant argues that the Government cannot meet its burden on the second factor because of the lack of medical records. But Dr. Cloutier credibly testified that the absence of records here does not change his opinion. Likewise, the Eleventh Circuit concluded in *Diaz* that "the lack of prior documented history of [the defendant's] reaction to anti-psychotic medication" did not alter its conclusion that the second factor was satisfied. *Diaz*, 630 F.3d at 1333. At any rate, while FMC Butner does not have medical records regarding the Defendant's response when the Defendant was previously treated with antipsychotic medication, they do at least have some indication that the Defendant responded to the medication.

The Defendant also relies on a Fourth Circuit case in his response in arguing that the Government did not meet its burden. *See* [DE 80] at 4 (citing *United States v. Evans*, 404 F.3d 227, 241 (4th Cir. 2005)). *Evans*, however, is inapposite. In *Evans*, the court found that the second factor was not satisfied because (1) the proposed treatment plan never specified the specific medication or dose to be administered, and (2) prison medical staff never considered the defendant's individual condition in reaching their conclusions. 404 F.3d at 240-42. By contrast, in this case, Dr. Cloutier has provided specific details regarding the treatment plan, the medication

to be used (Haldol), and the dose to be used (5mg, or potentially even starting as low as 1mg and titrating over time). He has also explained how staff plans to treat side effects and to monitor for any issues. Additionally, it is evident from the testimony of Dr. Cloutier and Dr. Grover that they have considered the Defendant's particular diagnosis, his history of using antipsychotic medication, his intelligence and characteristics, and the absence of contraindications. Thus, the issues present in *Evans* are not present here, and as noted above, finding that the second factor is satisfied here is in line with Eleventh Circuit precedent.

### B. Third *Sell* Factor

The third *Sell* factor is met here. This factor – "whether involuntary medication is necessary to further the government's interests" – requires that the Court "(1) find any 'alternative, less intrusive treatments are unlikely to achieve substantially the same results,' and (2) 'consider less intrusive means for administering the drugs,' such as a court order backed by the power of contempt, before considering more intrusive methods." *Diaz*, 630 F.3d at 1334-35 (quoting *Sell*, 539 U.S. at 181).

Here, Dr. Cloutier credibly testified that there is no less intrusive treatment that can be used to restore the Defendant to competency. There is no cure for the Defendant's condition and no reasonable hope that his condition will improve without treatment. Moreover, the Government presented clear and convincing evidence that the Defendant will not be restored to competency (and may worsen) without the use of antipsychotic medication, explaining that such medication is the "main treatment" for the Defendant's condition. Additionally, as the Government pointed out at the hearing, although the Defendant has expressed an interest in being declared competent, he has been unwilling to engage in the steps that have been recommended to achieve competency.

Simply stated, alternative, less intrusive means will not – or, at a minimum, are highly unlikely to – achieve the same result as antipsychotic medication.

Additionally, I have considered whether it may be appropriate to first order the Defendant to take antipsychotic medication (and face contempt if he refuses) or to explore some other course of action before ordering the involuntary administration of antipsychotic medication. In so considering, I have taken into account the GAL's position that an order to take the medication under the penalty of contempt may be appropriate. However, I find that clear and convincing evidence has established that doing so is very likely to be futile. FMC Butner staff has made numerous efforts to attempt to convince the Defendant to voluntarily take antipsychotic medication, but the Defendant has repeatedly, consistently, and adamantly refused to do so. In fact, the Defendant has stated that antipsychotic medication is "not real science" but rather "a symptom of our degenerative pseudo-intellectual culture." [DE 51] at 6. Thus, it is highly likely that the Defendant would refuse to comply with any Court order requiring him to take antipsychotic medication. Moreover, I find it significant that FMC Butner staff will provide the Defendant an additional opportunity to voluntarily take antipsychotic medication orally before proceeding with involuntary administration. Consistent with Dr. Cloutier's testimony, staff should provide the Defendant with a copy of this Court's order and give the Defendant the opportunity to voluntarily take the medication orally before injecting the medication involuntarily. If the Defendant refuses, involuntarily administration according to the treatment plan set forth in the Forensic Evaluation Addendum (and Dr. Cloutier's testimony) will be necessary to restore competency. *See Diaz*, 630 F.3d at 1335 (finding involuntary medication to be necessary to render the defendant competent where the defendant repeatedly refused to voluntarily take the

medication but would nonetheless be offered an additional opportunity to cooperate before staff proceeded with the involuntary injection of medication).

### C. Fourth *Sell* Factor

The fourth *Sell* factor – whether "involuntary medication is medically appropriate, '*i.e.,* in the patient's best medical interest in light of his medical condition,'" *Diaz*, 630 F.3d at 1331 – is also satisfied here. As indicated above, Dr. Cloutier credibly testified that the proposed treatment plan for the Defendant, which details the medication and dose to be used, is medically appropriate. And the Defendant's counsel acknowledged at the hearing that he could not present testimony to rebut the expert testimony regarding medical appropriateness.

Nonetheless, the Defendant's counsel argued – and noted that Dr. Cloutier acknowledged – that the Defendant provided reasonable reasons for not wanting to take antipsychotic medication. Specifically, as noted above, the Defendant reported side effects of sedation and restlessness from when he previously took antipsychotic medication.[6] While I agree that it is reasonable for the Defendant to be apprehensive about side effects, the fact is that the medical staff has prepared a medically appropriate treatment plan. That plan employs a long-used medication that treats the Defendant's diagnosed condition, considers the potential for side effects, considers the Defendant's individual medical circumstances to the extent possible, and includes plans to anticipate, address, and minimize side effects. It is certainly understandable that the Defendant

---

[6] I also recognize that the GAL's position is that he does not believe he can substitute his judgment for the Defendant's decision to not take antipsychotic medication. While the Court appreciates the GAL's time and effort on this matter, I do note that the GAL was only able to speak with the Defendant on the phone for about 40 minutes and that the call had to be terminated before the GAL was able to address "the most salient points." Significantly, though, according to the credible testimony of Dr. Cloutier and Dr. Grover, it is only when the Defendant begins discussing facts related to this case that the Defendant's psychosis and delusions are exhibited. But the GAL, due to no fault of his own, did not have an opportunity to witness such behavior.

does not want to experience side effects, but Dr. Cloutier's credible testimony established that the proposed treatment plan is in the Defendant's best interest *in light of the Defendant's medical condition*. Without such treatment, the Defendant's condition is highly unlikely to improve and may actually worsen. And, significantly, FMC Butner has proposed a treatment plan that will do everything possible to minimize and treat any side effects.

## V.     CONCLUSION

For the foregoing reasons, I respectfully RECOMMEND that the Motion [DE 75] be **GRANTED**.

The parties will have fourteen days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary, in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED in Fort Lauderdale, Florida, this 18th day of September 2023.

*Jared Strauss*
Jared M. Strauss
United States Magistrate Judge